IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ZACHERY WILSON,              )
AIS #00198832                )
   Plaintiff,             )
                             )
v.                           )    CIVIL ACTION NO. 15-00160-KD-N
                             )
TAWANNA BYRD, GARY HETZEL,   )
GWENDOLYN GIVENS, and        )
WALTER MYERS,                )
   Defendants.            )

## REPORT AND RECOMMENDATION

Plaintiff Zachery Wilson, an Alabama prison inmate proceeding *pro se,* filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(R), and is now before the Court Defendants' motion for summary judgment (docs. 25, 26). For the reasons stated below, it is recommended that summary judgment be granted in favor of Defendants Tawanna Byrd,[1] Gary Hetzel, Walter Myers, and Gwendolyn Givens, and the claims presented by Plaintiff Zachery Wilson be dismissed with prejudice.

### I.    Summary of Allegations.

Plaintiff Wilson is currently incarcerated at Holman Correctional Facility ("Holman"), where he is serving eight life sentences for convictions of attempted

---

[1] The complaint names Tawanna Byrd as the Chief Steward at Holman and a defendant in this action. (Doc. 1). Defendants' special report identifies Tawanna Thomas as Chief Steward at Holman. (Doc. 26 at 1). Given that Tawanna Byrd has been used in the caption of this case and has yet to be changed by the clerk's office, the court will continue to use the name "Tawanna Byrd" in its analysis but notes that the correct identification of Defendant Byrd is in actuality Tawanna Thomas.

murder, assault, auto theft, kidnapping, attempted kidnapping, rape, sodomy, and burglary.  (Doc. 1 at 5; Doc. 26-2 at 1; Doc. 26-2 at 3).  In his complaint, Wilson identifies numerous unsanitary conditions in the kitchen facility at Holman, which he claims are "inhumane" and constitute cruel and unusual punishment in violation of the Eighth Amendment.  (Doc. 1 at 4).  Specifically, he claims the food trays, cups, and utensils provided to the inmates are not properly cleaned due to maintenance issues with the dishwasher.  (*Id*. at 9).  Additionally, Wilson claims the meals prepared at Homan are not "wholesome balanced meals" and are prepared and served by individuals without hairnets or mouth protection.  (*Id*. at 4-5, 9).  And furthermore, Wilson asserts there are general sanitation problems in the kitchen such as bacteria (due to collapsed draining), mold, mildew and fungus on the ceiling, and infestation of roaches, rats, and vermin.  (*Id*. at 9-10, 12).  He contends these kitchen conditions are commonplace and caused him to suffer food poisoning on December 26, 2013, when he experienced symptoms of nausea and vomiting that persisted through December 31, 2013, and led to his hospitalization in the prison infirmary.  (*Id*. at 4).  In the infirmary he was treated with IV fluids, received a restricted diet, and was observed until he tolerated food, at which time he was released on January 2, 2014, without any lingering symptoms or recurrence of symptoms.[2]

The complaint alleges each named defendant was aware of these kitchen conditions, and failed to act or eradicate such conditions causing him to suffer food

---

[2]     Plaintiff Wilson states he was hospitalized on December 31, 2013 through January 4, 2014; however, the medical records presented by the defendants show that Wilson was actually released on January 2, 2014.  (*See* Doc. 26-6 at 8).

poisoning on December 26 through 31, 2013.  (*Id*. at 5-6, 13).  In attempt to prove the defendants knew of the unsanitary kitchen conditions, Wilson provided a copy of a complaint letter, addressed to "To whom it may concern," dated February 25, 2014, signed by 506 general population inmates at Holman.  (Doc. 1 at 15-21).  The letter references unsanitary living conditions at Holman, including, *inter alia*:

> There are live animals, living in the dining hall, such animals are birds, roaches & rats!  Birds fly over our heads, while we are eating, dropping waste . . .on our person, as well as our food!  Roaches crawl around at will, on tables, on counters, on walls, on the trays, cups & eating utensils! (The rats are the same.) "Rat feces" are often found in the food!  This to is prohibited by the Eighth Amendment!
> . . .
> The animal situation has been a problem for some time, the birds have been flying for at least 4 months now!  We have been complaining to the administration for way to long.  They have flat our refused to take action!
> The preparation process of our food is very poor!  We eat cold food on a regular basis!  Most foods are prepared way to early.  For example: at breakfast, they cook French fries that we will eat at lunch, the fries are then kept in an oven as an attempt to keep them warm!  What happens in this process is the oven dehydrates the food, thus causing the food to be hard like jerky! And it is still cold when served & there are 3 deep fryers.
> . . .
> The trays, utensil & cups are not being properly sanitized, which has lead to people being infected with food poison & or hepatitis A-B, etc. . .

(Doc. 1 at 15-16).[3]

Plaintiff Wilson filed this action on March 17, 2015, against Defendants Chief Steward Byrd, Wardens Myers and Givens, and former Warden Hetzel, in their official and individual capacities, seeking relief in the amount of $20,000 compensatory damages, $50,000 punitive damages, and $10,000 emotional damages

---

[3]    In addition to the unsanitary condition of the kitchen, the letter also complained of the lack of hot water for showers, the unprofessional attitudes of the Holman staff members, and the amount of "copays" for medical treatment.  (Doc. 1 at 15-16).

from each defendant.  (Doc. 1 at 7).  Defendants answered the complaint and filed a special report which were converted into a motion for summary judgment.  (Docs. 25, 26).  Plaintiff Wilson has responded to the motion for summary judgment (doc. 31), and after a thorough review of the record, the Court finds the motion for summary judgment is ripe for consideration.

## II.   Legal Standards.

### a.  Summary Judgment.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'").

The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th

Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.").   Once this initial demonstration is made, the "responsibility then devolves upon the non-movant to show the existence of a genuine issue . . . [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *see also Allen, supra*, at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and show by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'") internal citations omitted); *see Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, 'depositions, answers to interrogatories, and admissions on file.'") (internal quotations and citations omitted).

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S. Ct. 74, 133 L.Ed.2d 33 (1995); *see also LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party.").  In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Comer*, *supra*, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.").

In considering whether Defendants are entitled to summary judgment in this action, the Court has viewed the facts in the light most favorable to Plaintiff. *Comer*, *supra*, 265 F.3d at 1192 ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts.  A genuine dispute requires more than "some metaphysical doubt as to the material facts."  A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

*Garczynski*, *supra*, 573 F.3d at 1165 (internal citations omitted).  In addition, "[t]here is no burden upon the district court to distill every potential argument that

could be made based upon the materials before it on summary judgment." *Resolution Trust Corp.*, *supra*, 43 F.3d at 599.

### b. Official Capacity Claims.

To the extent Wilson is proceeding against the defendants in their official capacities, those claims fail.   (Doc. 1 at 1).   The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998).   "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." *Id*. (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).   "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).

Plaintiff alleges that Defendants Wardens Myers, Givens, former Warden Hetzel, and Chief Steward Byrd, all of whom were employed by the State of Alabama Department of Corrections as officers at Holman Correctional Facility at the time of the incident alleged in the complaint, violated his constitutional rights. It is well settled in this circuit that suits seeking monetary relief against state correctional officers in their official capacities are generally barred by the Eleventh

Amendment.  *See Taylor v. Adams*, 221 F.3d 1254, 1256 (11th Cir. 2000); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Dean v. Barber*, 951 F.2d 1210, 1215 n.5 (11th Cir.1992); Free, 887 F.2d at 1557.

> Official capacity lawsuits are "in all *respects other than name, . . . treated as a suit against the entity." Kentucky* v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity,  , 517 U.S. 44, 59, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Powell v. Barrett*, 496 F.3d 1288, 1304, 1308 (11th Cir. 2007) (state defendants sued in their official capacity for monetary damages are immune from suit under the Eleventh Amendment).

*Johnson v. Folks*, 2014 U.S. Dist. LEXIS 16027, 7-9 (S.D. Ala. Jan. 17, 2014) (quoting *Johnson v. Keaton*, No. 2:05-CV-1238-WKW, 2008 U.S. Dist. LEXIS 75356, 2008 WL 4493242, at *6 (M.D. Ala. Sept. 29, 2008)).

It is clear from the pleadings that the defendants were state officials at the time the action arose and are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.   Therefore, all defendants are entitled to absolute immunity from Plaintiff Wilson's claims asserted against them in their official capacities.

    **c.**   **Individual Capacity Claims.**

The defendants have denied that they violated any of Plaintiff's constitutional rights and have asserted the defense of qualified immunity. (*See* Doc. 25). Qualified immunity protects government actors from liability, when performing discretionary functions, to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). In *Lassiter v. Alabama A&M University*, 28 F.3d 1146 (11th Cir. 1994), the Eleventh Circuit restated the principles governing qualified immunity cases:

> That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities. . . . Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.

28 F.3d at 1149 (internal footnote and citations omitted) (bold added).

The defendant has the initial burden of proving that he acted within the scope of his discretionary authority. *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994). To determine whether a defendant acted within the scope of his discretionary authority, the court must consider whether the actions of which the plaintiff complains "(1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Id*. at 1566 (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). Thus, the term "discretionary authority" in this context includes actions that not only entail an element of discretion but also

those actions that are more ministerial in nature. *See id.* Accordingly, discretionary authority will generally be found if the defendant is working within the confines of his or her job.

In this case, Plaintiff does not contest that Defendants were acting within the scope of their discretionary authority. Each of the claims asserted against Defendants in this case is clearly related to the Defendants' responsibilities with regard to their jobs as Holman supervisors. Their alleged actions, or failure to act, in this case were, accordingly, within the scope of their discretionary authority. Thus, the Court will analyze whether or not Plaintiff has carried his burden of alleging a constitutional violation. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Because Plaintiff is a prisoner, the Eighth Amendment's proscription against "cruel and unusual punishments" governs his claims. *See Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, n.4 (11th Cir. 1995) (explaining if plaintiff was a pretrial detainee his claim would be govern by the Fourteenth Amendment versus the Eighth Amendment).

### III.  Discussion.

#### 1.  Conditions of Confinement Claim.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII. Prison conditions constitute cruel and unusual punishment only when they result in the "unquestioned and serious deprivation of basic human needs." *Rhodes*, 452 U.S. at 347.

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). Although the Amendment does not require comfortable prisons, it prohibits inhumane ones. *Id.* The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoted in *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)). "[B]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety." *Harris v. Thigpen*, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in *Collins v. Homestead Corr. Inst.,* 452 F. App'x 848, 850-851 (11th Cir. 2011)). "[T]o make out a claim for an unconstitutional condition of confinement, 'extreme deprivations' are required . . . ." *Thomas v. Bryant* 614 F.3d 1288, 1304, 1306-07 (11th Cir. 2010) (citing *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

*Magwood v. Beem*, 4:14cv314-MW/CAS, 2015 U.S. Dist. LEXIS 22875, *42

(N.D. Fla. Jan. 27, 2015).  In this action, Wilson claims not only that he

suffered an incident of food poisoning on December 26, 2013, but:

> that each defendant herein were conscious of the fateful chance the plaintiff could experience and endure Infectious Maladies, Bacteria's, and Septicemia, therefrom the inhuman, inadequate, and grossly disproportionate food and conditions within the deplorable/appalling, dilapidated and sordid kitchen-cafeteria, and failed to take reasonable steps to abate and/or ameliorate the conditions, food preparation, and services thereof, challenged herein this lawsuit, and therefore each defendant "deliberate indifference" to the known "substantial risk" of serious harm to the plaintiff's safety, health, welfare, and well-beings, resulted in the plaintiff experiencing, and enduring a severe crisis of hypochondria….Each defendant conspicuously had objective and subjective knowledge of the birds, rates, roaches and other vermin within the kitchen-cafeteria…

(Doc. 31 at 5) (capitalization and punctuation omissions).

To demonstrate a violation of an Eighth Amendment right in a section 1983

prison conditions action, a plaintiff must prove three elements: (1) "a condition of

11

confinement that inflicted unnecessary pain or suffering"; (2) "the defendant's deliberate indifference to that condition;" and (3) "causation." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164, 114 S. Ct. 1189, 127 L. Ed. 2d 539 (1994)(internal quotation marks and citations omitted).  "The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries." 995 F.2d at 1538-39.

### a. Condition of Confinement and Causation.

As to the first and third element of establishing his claim, Plaintiff fails to show that a condition of his confinement, an unsanitary kitchen, was the proximate cause of harm suffered, nausea and vomiting.  While Plaintiff Wilson contends he suffered food poisoning due to the kitchen conditions, this is a mere conclusory statement lacking evidentiary support, *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984) ("In civil rights actions . . . a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory."), as Wilson fails to identify what he ate or link his nausea and vomiting symptoms to any food obtained from the kitchen or a kitchen condition.  He further fails to allege any other inmate or staff member becoming ill after eating the same food(s) he ate, which would surely occur in a case of food poisoning from a communal facility like a prison.  (See Doc. 26-1 at 2 where Defendant Byrd avers she has no knowledge of any other inmate or staff member getting sick at the alleged time.).  Additionally,

the medical records support that Wilson was in need of medical care due to nausea, but the records belie his claim of "food poisoning."

A comparison of the medical records to Plaintiff's allegations creates contradictory theories or causes for his nausea and vomiting.  The submitted medical records show that on December 13, 2013, Wilson was examined during sick call and complained he felt dizzy and nauseous, like he was going to pass out.  (*Id.* at 31).  On December 26, 2013, the day Wilson contends he suffered food poisoning, he was examined by the nursing staff and complained, "My stomach is very irritated and I can't hold any of my food down without throwing-up!  **It's been bothering me off and on since I inhaled the burning smoke in seg!**"[4]  (*Id.* at 24) (emphasis added).  At this time he was prescribed Phenergan for his nausea symptoms.  (*Id.*).  Wilson was seen again on December 28, 29, and 30, 2013, with complaints of abdominal pain and vomiting after eating, and Phenegran and Maalox were prescribed to treat his symptoms.[5]  (*Id.* at 26, 27, 29).  On December 31, 2013, Wilson was admitted to the infirmary due to his complaints of nausea and vomiting, where he received Prilosec for his stomach discomfort and Meclizine and intravenous Phenergan for his nausea.  (*Id.* at 41).  The following day, January 1, 2014, Wilson denied any symptoms of nausea or vomiting, stated he did not want

---

[4]     The record details that on December 2, 2013, Wilson received a Body Chart after an undisclosed incident.  (Doc. 26-6 at 36).  The body chart notes his breathing to be normal, non-labored and his lungs were clear.  (*Id.*).  During the examination, he stated to the nurse that "they are setting fire after fire out there."  (*Id.*).  Arguably, on December 26, 2013, when Wilson referred to smoke inhalation, he may have been referencing this December 2, 2013 incident.

[5]     The nurse commented on December 29, 2013, that when Wilson was brought to the health care unit, he initially "engaged in lively conversation."  (Doc. 26-6 at 27).

any more nausea medication, and requested more food. (*Id*. at 41-44). Wilson continued to improve throughout the day and on January 2, 2014, Wilson stated he was "ready to go back down the hall," and he was released from the infirmary. (*Id*. at 8, 46). Thus, based on the record, the undersigned finds that beyond the unfortunate symptom of nausea/vomiting, there are no direct links to the conditions of confinement and to Wilson experiencing a bout of food poisoning, much less any evidence directly connecting the conditions of the kitchen to Plaintiff's nausea. In fact, the record reveals in December of 2013, Wilson attributed his nausea to smoke inhalation. (Doc. 26-6 at 24). The undersigned finds no indication or evidence of Wilson ever complaining to the medical staff that he got sick on December 26, 2013, after eating food prepared in the condition or due to the conditions of the kitchen. Furthermore, the record is void of a medical professional diagnosing Wilson with food poisoning or of information of anyone else being ill due to the food on December 26, 2013. It is not until the filing of this complaint on March 17, 2015 that Plaintiff asserts the conditions of the kitchen caused his sickness on December 26, 2013.

Taking Plaintiff's allegation as true, that he became ill from tainted food served at Holman on December 26, 2013, does not, alone, amount to a constitutional deprivation. *See Islam v. Jackson*, 782 F. Supp. 1111, 1114 (E.D. Va. 1992) (holding an isolated two week period of food contamination, including food infested with maggots, not sufficiently serious). Courts have consistently admitted that the lack of sanitation in certain prison kitchen and food areas, while "appalling" and a risk factor for "contracting any number of food-borne diseases," does not in and of itself

14

amount to an Eighth Amendment violation. *See Grubbs v. Bradley*, 552 F.Supp. 1052, 1128 (D.C. Tenn. 1982) (The presence of vermin alone did not amount to a constitutional violation, but the court found multiple unsanitary conditions.). Additionally, in suits such as this one, single incidents of food poisoning are not serious enough to constitute a violation of the Eighth Amendment. *See Watkins v. Trinity Serv. Group Inc.*, 2006 U.S. Dist. LEXIS 85592 (M.D. Fla. Nov. 27, 2006) (isolated food poison and maggot incident were not sufficiently serious deprivations to violate prisoner's constitutional right, as physical injuries of diarrhea vomiting, cramps, and nausea were considered *de minimis*); *George v. King*, 837 F.2d 705, 707 (5th Cir. 1988) (holding that a single incident of prisoner food poisoning is not a constitutional violation); *Bennett v. Misner*, 2004 U.S. Dist. LEXIS 19568, 2004 WL 2091473 *20 (D. Or., Sept.17, 2004) ("Neither isolated instances of food poisoning, temporary lapses in sanitary food service, nor service of meals contaminated with maggots are sufficiently serious to constitute an Eighth Amendment violation.").

> [I]f prisoners regularly and frequently suffer from food poisoning with truly serious medical complications as a result of particular, known unsanitary practices which are customarily followed by the prison food service organization, and the authorities without arguable justification refuse to attempt remedial measures, the requisite deliberate indifference might well be manifested or inferred. But such deliberate indifference is certainly not even suggested by a single incident . . .

*George v. King*, 837 F.2d 705, 707 (5th Cir. 1988).

Furthermore, even if Wilson had prevailed in showing that the kitchen conditions caused his harm, he has failed to prove deliberate indifference on the part of Defendants.

b.      **Deliberate Indifference.**

Wilson makes the blanket statement that all Defendants knew of the atrocious conditions in the kitchen and knew that he, as well as other inmates, could be harmed by the conditions, but failed to act resulting in his contracting food poison.  He submits three sources of evidence in support of showing the subjective knowledge of the defendants in this action: 1) General Population Inmate letter regarding unsanitary living conditions, 2) the case citation of *Pugh v. Locke*, 406 F.Supp. 318 (M.D. Ala. 1976), and 3) the verbal responses given by each defendant when Wilson personally approached him or her and inquired about the bird in the kitchen.  Defendants, however, offer affidavits and evidentiary support showing they did act to eradicate known unsanitary conditions in the kitchen, and Wilson does not put forth any evidence disputing or contradicting the evidence put forth by Defendants.[6]

---

[6]      Plaintiff challenges Defendants' motion for summary judgment (or their evidence) in his response that "he totally disagree[s]" with Defendant Byrd's averment that cases of food poisoning typically occur in large numbers and are evaluated by testing by the Health Department."  (Doc. 31 at 10).  This argumentative response is totally unsupported by Wilson and is simply a reiteration of his claim that he contracted a case of "food poison" on December 26, 2013.

Additionally, Wilson disputes Defendants' account of an incident with a single bird in the cafeteria and argues there were multiple birds that flew in the kitchen area for weeks.  (Doc. 31 at 12).  As to this contention, the court takes judicial notice of case number 14-cv-0114-KD-B, filed by Wilson that contains overlapping facts concerning the conditions at Holman, in particular "the bird."  *See Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1166 n.11 (11th Cir. 1995) (At its discretion, the Court may take judicial notice of documents filed in other judicial proceedings, because they are public documents.).  In this unrelated complaint, Wilson references supervisors knowing "about *the bird* in the kitchen;" that "[t]hey would say that bird can't do no harm.  And they just let *the bird* continue to fly over our food and drop turds from the sky on us like H-bombs."  (S.D. Ala. Case No: 14-cv-0114-KD-B, Doc. 1 at 14-15)(emphasis added).  Notably, Wilson refers to only a single bird in this complaint.

The General Population letter, filed by Wilson, fails to support his constitutional claim because it is dated February 25, 2014, approximately two months after he suffered the symptoms of nausea and vomiting. (*See* Doc. 1 at 15; Doc. 31 at 5-7). Additionally, the letter is not addressed to any specific person, much less a named defendant.[7] Thus, the letter fails to demonstrate that any named Defendant knew of the kitchen conditions on December 26, 2013 and failed to act, thereby, causing him to suffer food poisoning.[8]

Wilson maintains the conditions of his confinement on December 26 through 31, 2013 were "'substantially similar' to the extreme conditions described within" *Pugh v. Locke*, 406 F.Supp. 318 (M.D. Ala. 1976), *aff'd as modified by, Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *rev'd in part on other grounds, Alabama v. Pugh*, 438 U.S. 781 (1978), and argues that pursuant to *Pugh* the conditions at Holman violate the Eighth Amendment. (Doc. 31 at 1-4). *Pugh* consisted of consolidated class actions of plaintiff prisoners seeking declaratory and injunctive

---

Despite Wilson's arguably refutable objection, the number of birds is not a material issue in the determination of this suit, as Wilson fails to carry his burden of establishing deliberate indifference.

[7] Plaintiff Wilson does allege that he "submitted duplicates of [the letter] to the defendants herein, which was to 'No Avail.'" (Doc. 31 at 9). Taking as true Wilson's allegation that each defendant received a copy of the letter, no one could have received it before Plaintiff was sickened in December of 2013, as it wasn't written until February 25, 2014.

[8] Wilson's response to the motion for summary judgment also references Defendants' knowledge of the conditions of confinement due to the "Peaceful General Population Shutdown" which occurred on January 1, 2014. (Doc. 31 at 7). This, however, is similar to the written letter in that the shutdown does not prove subjective knowledge on the part of the defendants as it occurred subsequent to Wilson's sickness and hospitalization.

relief for conditions of confinement that amounted to constitutional violations.[9]  In comparing his case to *Pugh*, Plaintiff Wilson identifies numerous violent acts, including deaths, which have occurred at Holman and lists general deficiencies, such as overcrowding, noise levels, recreation space, vermin and insects, medical facilities and treatment, visitation, and educational and rehabilitative programming, as evidence that on December 26 through 31, 2013, he experienced the same or similar conditions at Holman that the court found to be unconstitutional in *Pugh*. (Doc. 31 at 1-4).  Wilson's reliance on *Pugh*, however, is flawed.

First, Wilson has drafted his §1983 action to challenge only the kitchen conditions at Holman; he cannot reframe or redraft his complaint in a response to summary judgment.  Even if the court were to allow his expanded argument, Wilson still fails to link his nausea and vomiting to any of the complained of prison conditions.  Second, on December 28, 1988, in *Newman v. Alabama*, Civil Action No. 3501-N, 1988 U.S. Dist. LEXIS 18633 (M.D. Ala. 1988), Judge Varner determined the state prison system had changed since *Pugh* and that all future lawsuits must proceed separately for violations of the Constitution and not based on violations of the injunctions placed by *Pugh*.  Therefore, Wilson cannot rely merely on the claims and injunction ordered by *Pugh* but instead must meet his burden of pleading an

---

[9]     The facts of *Pugh* established excessive overcrowding in the prisons, a lack of guards to reasonably protect the inmates from each other, lack of sanitation throughout the prisons, restricted visitation and rehabilitation programs, and lack of medical or mental health treatment.  *Id*.  The court determined the overcrowding to be primarily responsible for or the exacerbating source of all other problems at the prisons.  *Id*. at 328-30.

Eighth Amendment violation based on establishing Defendants acted with deliberate indifference, and that burden he fails to carry.

Lastly, Wilson claims Defendants did nothing to abate or improve the unsanitary conditions of the kitchen, thereby causing his nausea and vomiting on December 26, 2013.  In attempt to prove deliberate indifference, Wilson claims he personally asked each defendant what he or she was going to do about the bird flying in the kitchen area, and that each defendant responded in the following way: Defendant Byrd stated, "you are a 'inmate,' you don't tell me how to do my job" (doc. 1 at 10); Defendant Hetzel stated, " Yall fix it, yall fix everything else, get your 'laundry bag', and 'catch' the 'birds'" (*id*. at 10-11); Defendant Givens stated, "So what, aint no birds flying inside my office" (*id*. at 11); Defendant Myers stated, Birds, Oh yall don't like the birds." (*Id*.).  While these verbal responses are flippant at best, they do not indicate a failure to act for the purpose or with the knowledge of Plaintiff contracting food poison.  In fact, Defendants all acknowledge that a bird did enter the kitchen facility through a vent and flew into the dry storage room. (Doc. 26-1 at 1; Doc. 26-2 at 2; Doc. 26-3 at 1; Doc. 26-4 at 1).  Defendant Givens avers that she (and others) attempted to remove the bird unsuccessfully (doc. 26-3 at 1-2), and all Defendants aver that an inmate was ultimately able to capture the bird and remove it from the area.  (Doc. 26-1 at 1; Doc. 26-2 at 2; Doc. 26-3 at 1-2; Doc. 26-4 at 2).  Thus, the record shows that through no fault of Defendants, the bird entered the facility, and Defendants attest, and Plaintiff does not deny, that

they attempted to remedy the situation, albeit not in the manner Wilson desired by contacting an exterminator.

Furthermore, the record before the court reveals several measures Defendants have taken to ensure the health and safety of the inmates and to comply with health standards in keeping a sanitary kitchen environment for Holman.  The record shows that Holman has a pest control contract.  (Doc. 26-2 at 2).  The prison also complies with routine inspections by the Alabama Department of Public Health, the Alabama Department of Corrections Environmental Supervisor, and the Alabama Department of Corrections Institutional Coordinator, as well as the facility's wardens, captains, and kitchen stewards.  (Doc. 26-2 at 1; Doc. 26-3 at 2; Doc. 26-4 at 2).  Dishwasher temperatures are checked and recorded three (3) times daily by the Hazard Analysis Critical Control Point Program to ensure all eating utensils, trays, and cups are properly sanitized.  (*Id*. at 2).  Covered food warmer trays are used to preserve food at safe temperatures until the food can be served, and the temperature of the foods are checked every two hours to prevent any food borne illnesses.  (*Id*.; Doc. 26-1 at 2).  Additionally, the facility is cleaned on a regular basis by the inmates.  (Doc. 26-2 at 2).

Plaintiff Wilson has failed to go beyond his pleadings and show or even allege facts showing there is a genuine issue for trial; therefore, Wilson has failed to carry his burden of overcoming summery judgment. *See Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving

party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, 'depositions, answers to interrogatories, and admissions on file.'"). Therefore, the undersigned recommends summary judgment be granted in favor of Defendants.

### 2. Supervisory Liability Claim.

As to Wilson's claim against Defendants that they are responsible for his illness due to the fact that they are supervisory officers and are responsible for the conditions present at Holman, such a claim is rooted in the theory of *respondeat superior* and is not actionable. In order to state a claim upon which relief can be granted in a § 1983 action, a plaintiff must establish a causal connection between each defendant's "actions, orders, customs, policies, or breaches of statutory duty and the alleged deprivation of his constitutional rights." *Frankum v. Chapman*, 2009 U.S. Dist. LEXIS 35267, 2009 WL 1118875, *3 (S.D. Ala. 2009) (citations omitted). Liability for an alleged constitutional violation cannot be established on the basis of a theory of *respondeat superior*. *See Edwards v. Ala. Dep't of Corrs.*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . .").

> "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (concluding supervisory officials are not liable on the basis of *respondeat superior* or vicarious liability). Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the

alleged constitutional deprivation. *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5; *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *5 (quoting B*raddy v. Fla. Dept. of Labor & Emp't,* 133 F.3d 797, 802 (11th Cir.1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy ... result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at   , 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). In instances where supervisory liability is based on a supervisor's custom or policy, a plaintiff must show that the custom or policy was "the 'moving force [behind] the constitutional violation.'" *Pinkney v. Davis*, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." *Id*. (citations omitted).

Wilson alleges Defendants, as administrators at Holman, knew (and have known) of the unsanitary conditions in the prison's kitchen. (Doc. 1 at 12). He claims there are no hairnets or mouth protection used while food is being prepared, that there are bird droppings on the food, that the food storage area is infested with

rats, that the dishwasher is not properly maintained to ensure the utensils are cleaned, that the ceiling contains mold, mildew and fungus. (*Id*. 9-10). Reading the facts in the light most favorable to Wilson, the undersigned finds no support that Defendants have established a policy of providing or tolerating unsanitary conditions necessary to establish a constitutional violation.

The record shows that Defendants not only comply with inspections by the Alabama Department of Public Health, but Defendants work to remedy the necessary items or defects identified by the department when necessary. For instance, on May 13, 2013, seven months prior to the time of Wilson's complaint, the health department inspected the Holman prison kitchen and found the food preparation methods used were sanitary, that food storage (including "temperature requirements during receiving, cooking, hot holding, cooling") were all safe, food was separated and protected from contamination, cooling and thawing methods were approved, cooking surfaces were clean, and the equipment and utensils were sanitized. (Doc. 26-5 at 5). That inspection did find four critical items of concern: 1) the back flow preventer on the hose in washroom, 2) roaches were present, 3) the shield on the light above the grill needed attention, and 4) the fry baskets were broken. (*Id*.). The following health department inspection was conducted on June 19, 2014, at which time the inspector found four critical items of concern: 1) plumbing leaks at the sink, 2) spray nozzle in the washroom, 3) no shield on lights in dry storage, and 4) roaches present. (*Id*. at 3). While the record shows there were roaches present at both inspections, there is a notation of the inspection report

that Baldwin Pest Control was contacted and came on June 19, 2014 (*id*. at 2), and Defendants further aver that Holman has a contract for services with them. (Doc. 26-1 at 2; Doc. 26-2 at 2; Doc. 26-3 at 2; Doc. 26-4 at 2). Notably, roaches were the only repeated area of concern on both inspections, indicating that Defendants attempted to fix the areas of concern itemized in the previous inspection – which negates Wilson's effort to establish that Defendants turn a blind eye to the conditions of the kitchen or that they condone unsanitary practices.

Furthermore, the independent examination of the kitchen facilities by the Department of Health call into question some of Wilson's allegations as the inspections do not criticize the sanitation practices of food servers, nor do they mention mold, mildew, fungus, or bacteria on the sink, walls, or ceiling, and they fail to indicate the presence of any insects or vermin other than roaches. The undersigned finds no factual support in the record that Defendants have turned a blind eye to unsanitary conditions or practices in the kitchen at Holman and Plaintiff Wilson has failed to carry his burden of showing a genuine issue of material fact exists for trial. Thus, it is recommended that Defendants' motion for summary judgment be granted.

## III.   Conclusion.

Based on the foregoing analysis, the undersigned concludes that there are no genuine issues of material fact, and that Defendants are entitled to judgment as a matter of law on all claims and causes of action interposed by Plaintiff. Therefore, it is recommended that Defendants' motion for summary judgment be **granted** on

all counts and that Plaintiff Wilson's action against Defendants Tawanna Byrd, Gary Hetzel, Walter Myers, and Gwendolyn Givens be **dismissed** with prejudice.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that

merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

   **DONE** this the 11ᵗʰ day of March 2016.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**
